**PADDOCK PUBLICATIONS, INC., doing business as The Daily Herald, Plaintiff–Appellant,**

v.

**CHICAGO TRIBUNE COMPANY, et al., Defendants–Appellees.**

No. 96–2058.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 8, 1996.

Decided Dec. 16, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 21, 1997.*

---

* Judge Cummings took no part in consideration of the suggestion for rehearing en banc.

James T. Malysiak, argued, Lee A. Freeman, Jr., Albert F. Ettinger, Freeman, Freeman & Salzman, Chicago, IL, for Paddock Publications, Inc.

Constantine L. Trela, William F. Conlon, Debra J. Stanek, William O. Fifield, Howard J. Trienens, argued, Sidley & Austin, Chicago, IL, Joseph P. Thorton, Chicago Tribune Co., Employees Relations, Chicago, IL, for Chicago Tribune Co.

Steven J. Harper, Anne J. McClain, Kirkland & Ellis, Chicago, IL, for Chicago Sun–Times, Inc.

Daniel K. Mayers, Alice Mott Stoeppelwerth, Wilmer, Cutler & Pickering, Washington, DC, for New York Times Syndication Sales Corp.

Albert J. Salvi, Daniel J. Sugrue, argued, Albert J. Salvi & Associates, Waukegan, Il, for Creators Syndicate.

Gerald A. Connell, Lee H. Simowitz, Baker & Hostetler, Washington, DC, John D. Parker, Baker & Hostetler, Cleveland, OH, Eugene E. Gozdecki, Richard A. DelGiudice, Joseph R. Ziccardi, Gozdecki & DelGiudice, Chicago, IL, J. Michael Frascati, The Hearst Corp., New York City, for King Features Syndicate, Inc.

Before EASTERBROOK, MANION, and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

Newspapers' content has many sources. To the work of their own staff, papers add dispatches from syndicated news services such as the Associated Press and Reuters that station reporters or stringers across the globe. Leading newspapers such as the *New York Times, the Los Angeles Times, the Washington Post, the Chicago Tribune*, and the *Wall Street Journal* have set up supplemental news services. The New York Times News Service carries that paper's stories; the Los Angeles Times/Washington Post News Service combines stories from those papers; the Knight–Ridder/Tribune Information Service pools stories from the *Tribune* and the Knight–Ridder chain's papers. Subscribers can reprint the originating paper's stories (and those of other papers that contribute to the supplemental service) in the subscribers' home markets. Cartoons, op-ed pieces, book reviews, chess columns, puzzles, and other features are available from syndicators such as United Press Syndicate, United Features Syndicate, King Features Syndicate, Creators Syndicate, and Tribune Media Services.

Supplemental news services and features syndicators offer exclusive contracts to subscribers in each metropolitan area. Because the *Chicago Tribune* subscribes to the New York Times News Service, stories from the Times are unavailable to the *Chicago Sun–Times* and smaller newspapers in the Chicago area; the *Sun–Times* subscribes to the Los Angeles Times/Washington Post News Service, which therefore is unavailable to the *Tribune* and smaller papers. News services and features syndicates charge by the circulation of the subscribing paper, and they therefore strive to sign up the largest paper in each market. Exclusivity is one valuable feature the service offers, for a paper with exclusive rights to a service or feature is both more attractive to readers and more distinctive from its rivals. When selling to smaller papers, however, the supplemental news services and features syndicates generally do not offer exclusivity—for they still hope to interest the larger, and therefore more lucrative, papers in the market (which can sign up later with exclusive rights against all but the original customer).

As a rule, the larger papers subscribe to the more popular services and features; or perhaps it is the very fact that a feature runs

in a market's larger papers that makes it "more popular." Causation need not concern us. No matter which way it runs, smaller papers perceive that they get the crumbs. This suit, by the *Daily Herald*, the number three general-interest paper in the Chicago area (with 6.7 percent of average weekly readership), contends that the pattern of exclusive distribution rights violates § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by making it harder for small papers to grow. Like the district court, we assume without deciding that "general-interest-newspaper readership in the Chicago SMSA" is a market. According to the complaint, the *Chicago Tribune* and the *Chicago Sun–Times* have locked up the "most popular" or "best" supplemental services and features, injuring consumers by frustrating competition. (We assume that "the best" services and features can constitute a market, although it sounds more like an aesthetic judgment; no one would say that "the best film of 1996" has a monopoly of any market just because there can be only one "best" film.) The *Daily Herald* views the Knight–Ridder/Tribune Information Service as a distant third to the supplemental news services the *Tribune* and *Sun–Times* use, and even it is unavailable because the *Tribune* will not license its stories to a competitor in its home market. The Herald concedes that the Associated Press, Reuters, and many quality comics and features are available to it (for example, it publishes *Dilbert*, one of today's most-followed comic strips) but insists that the best ones are committed to its larger rivals. After assuming that all of the *Herald's* allegations are true, the district court dismissed the complaint for failure to state a claim on which relief may be granted. 1995–2 Trade Cas. ¶ 71,255.

The *Herald* does not contend that the *Tribune* has conspired with the *Sun–Times* to bring about this state of affairs. Compare *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (holding that the Associated Press, a consortium of newspapers, must eliminate an exclusivity feature that could be traced to agreement among horizontal rivals). Nor does it contend that the supplemental news services and features syndicators (or their contributing papers and authors) have agreed among themselves. It concedes that each has adopted its method of doing business independently; they take the same approach to distribution because each has discovered that it is the most profitable way to do business. All of the contracts between services and newspapers are terminable at will or on short notice (usually 30 days, although some features require a year's notice). Instead of seeing whether money could persuade a supplemental news service to cut off one of the larger papers—the *Herald* has never tried to outbid the *Tribune* or *Sun–Times*, either on a total compensation basis or a per-subscriber basis—it asked the district court to declare that the antitrust laws entitle it to receive the leading supplemental news services and features without regard to the contractual exclusivity that the *Tribune* and *Sun–Times* currently enjoy. At times the *Herald* suggests that it would be happy with rights to articles from the *New York Times, Los Angeles Times*, and *Washington Post* that the *Tribune* and *Sun–Times* do not reprint; "there's plenty for all" is a theme of its brief. But this won't work well for news (must the *Tribune* give the *Herald* advance notice of its contents?) or at all for features, which are sold one at a time. For example, King Features Syndicate does not sell its entire portfolio to one paper per market; the *Tribune, Sun–Times*, and *Herald* each publish some of its comics and columns. So the *Herald* necessarily argues that it is entitled to run *Peanuts* and *Dick Tracy* even though these comic strips also appear in the *Tribune*.

This is fundamentally an "essential facilities" claim-but without any essential facility. There are three supplemental news services that the *Herald* is willing to acknowledge as major competitors (and others besides, though the *Herald* denigrates them). There are hundreds, if not thousands, of opinion and entertainment features; a newspaper deprived of access to the *New York Times* crosswords puzzles can find others, even if the *Times* has the best known one. Unlike *United States v. Terminal Railroad Ass'n*, 224 U.S. 383, 32 S.Ct. 507, 56 L.Ed. 810 (1912), the granddaddy of these cases, in

which the Court held that a bottleneck facility that could not feasibly be duplicated must be shared among rivals, this case does not involve a single facility that monopolizes one level of production and creates a potential to extend the monopoly to others. We have, instead, competition at each level of production; no one can "take over" another level of production by withholding access from disfavored rivals. *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032–34 (7th Cir.1988), holds that the existence of three competing facilities not only means that none is an "essential facility" but also means that each of the three is entitled to sign an exclusive contract with a favored user. Other firms that want to enter the market can do so by competing at intervals for these contracts.

Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common. Every year or two, General Motors, Ford, and Chrysler invite tire manufacturers to bid for exclusive rights to have their tires used in the manufacturers' cars. Exclusive contracts make the market hard to enter in mid-year but cannot stifle competition over the longer run, and competition of this kind drives down the price of tires, to the ultimate benefit of consumers. Just so in the news business—if smaller newspapers are willing to bid with cash rather than legal talent. In the meantime, exclusive stories and features help the newspapers differentiate themselves, the better to compete with one another. A market in which every newspaper carried the same stories, columns, and cartoons would be a less vigorous market than the existing one. And a market in which the creators of intellectual property (such as the *New York Times*) could not decide how best to market it for maximum profit would be a market with less (or less interesting) intellectual property created in the first place. No one can take the supply of well researched and written news as a given; legal rulings that diminish the incentive to find and explicate the news (by reducing the return from that business) have little to commend them.

■ In what way could the news services' practices harm consumers? Tacit collusion (economists' term for "shared monopoly") could be a source of monopoly profits and injury to consumers even if none of the stages of production is monopolized. Some distribution arrangements might be objectionable because they facilitate tacit collusion. But collusion, tacit or express, requires some horizontal cooperation, or at least forbearance from vigorous competition among rivals. See Herbert Hovenkamp, *Federal Antitrust Policy* § 4.4 (1994). Compare Richard A. Posner, *Antitrust Law: An Economic Perspective* 42–77 (1976), with Donald F. Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655 (1962). Although the newspaper market is concentrated on the readers' side, the inputs to newspaper production are unconcentrated and therefore do not facilitate tacit collusion in the more concentrated market. The New York Times News Service competes for column inches of ink not only with other supplemental news services but also with the Associated Press, Reuters, and the reporters of the subscribing papers. Markets here are less concentrated, and use fewer of the devices that facilitate oligopolistic interdependence, than the markets in *E.I. Du Pont de Nemours & Co. v. FTC*, 729 F.2d 128 (2d Cir.1984), where an antitrust claim was nonetheless rejected. The *Herald* does not argue that the practices at hand facilitate tacit collusion.

What the *Herald* does argue is that a mixture of fewness of firms, exclusive contracts, and relations between suppliers and users of news that endure despite short contract terms, hampers the growth of small rivals even though each market is competitive. Such an argument does not come within any of the economic approaches to tacit collusion—but it does, the *Herald* insists, come within the holding of *FTC v. Motion Picture Advertising Service Co.*, 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953). The *Herald* relies as well on *Standard Oil Co. v. United States*, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949) (*Standard Stations*), and *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962), but rightly treats *Motion Picture Advertising Service* as its best case.

Four companies signed approximately 75 percent of the nation's motion picture theaters to exclusive-dealing contracts for advertisements to be displayed along with the films. Having signed with one supplier of ads, a theater could not display ads furnished by another. The Federal Trade Commission concluded that these arrangements, in the aggregate, stifled competition by firms that wanted to enter the business of furnishing advertising to theaters, and therefore violated § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45: as the Supreme Court phrased the FTC's conclusion, "due to the exclusive contracts, respondent and the three other major companies have foreclosed to competitors 75 percent of all available outlets for this business throughout the United States." 344 U.S. at 395, 73 S.Ct. at 363–64. According to the *Herald*, the same kind of thing now has occurred in the news industry, making it equally appropriate to aggregate the market shares of the firms without proof of horizontal collaboration (for there was none in *Motion Picture Advertising Service*). The district court was not impressed, for the approach of *Motion Picture Advertising Service*—which depends on "foreclosure" of sales to competitors without proof of injury to consumers—reflects a bygone day in antitrust analysis. But the district court properly did not rely entirely on a belief that the opinion is a derelict. See *Khan v. State Oil Co.*, 93 F.3d 1358, 1362–64 (7th Cir.1996) (implementing another antique antitrust opinion that is unlikely to be reaffirmed if the Supreme Court revisits the subject). It held that *Motion Picture Advertising Service* is not controlling even if it remains authoritative.

First, *Motion Picture Advertising Service* was decided under § 5 of the FTC Act. The Commission has the authority under that provision to forbid practices that pose risks to effective competition, even when they do not violate the Sherman Act. The Court remarked on this in *Motion Picture Advertising Service:* "The 'unfair methods of competition,' which are condemned by § 5(a) of the Act, are not confined to those that were illegal at common law or that were condemned by the Sherman Act." 344 U.S. at 394, 73 S.Ct. at 363. A district court lacks the FTC's power to go beyond the limits of the Sherman Act. Similarly, *Standard Stations* was decided under § 3 of the Clayton Act, 15 U.S.C. § 14, and does not assist the plaintiff in a Sherman Act case that cannot be characterized as involving tie-in sales. Granted, the Court remarked in *Motion Picture Advertising Service* that "a device which has sewed up a market so tightly for the benefit of a few falls within the prohibitions of the Sherman Act", 344 U.S. at 395, 73 S.Ct. at 364, but this bald and unreasoned assertion is not conclusive. Poorly reasoned holdings bind the inferior courts; unreasoned dictum does not—and this statement was obiter dictum, for the Court had emphasized only a paragraph before that it was deferring to the FTC's findings as § 5 of the FTC Act requires. No subsequent case has read *Motion Picture Advertising Service* to abolish the requirement of concerted action under § 1 of the Sherman Act.

Second, *Motion Picture Advertising Service* involved exclusive *dealing*, while this case involves exclusive *distributorships*. Despite the similarity in nomenclature, there is a difference—one vital to the theory of *Motion Picture Advertising Service* itself. See generally Hovenkamp, *Federal Antitrust Policy* § 10.8. An exclusive dealing contract obliges a firm to obtain its inputs from a single source. Each of the theaters was committed to one distributor for all of its ads. This was the genesis of the concern about foreclosure. A new advertising distributor could not find outlets. An exclusive distributorship, by contrast, does not restrict entry at either level. None of the newspapers in Chicago (or anywhere else) has promised by contract to obtain all of its news from a single source—and the sources have not locked all of their output together (unlike the "block booking" involved in *Loew's*). A new entrant to the supplemental news service business could sell to every newspaper in the United States, if it chose to do so. Existing features syndicates sell to multiple firms in the same market (although most features go to one paper per city; this is the exclusive distribution aspect of the contracts). So vendors can and do sell news and features to multiple customers, and customers can and

do buy news and features from multiple vendors. "Foreclosure" of the kind about which *Motion Picture Advertising Service* was concerned does not occur under exclusive distribution contracts.

Third, the FTC and the Supreme Court concluded that even exclusive dealing contracts are lawful if limited to a year's duration. 344 U.S. at 395–96, 73 S.Ct. at 363–64. The Commission saw that exclusivity can promote competition by making it feasible for firms to invest in promoting their products—for these costs would not be recoverable if the contracts were of very short terms, or if rivals could exhibit the same films and obtain the benefit of this promotional activity. Moreover, with year-long contracts, the entire market is up for grabs. A new entrant can sell to a twelfth of the theaters in the first month, a sixth of all theaters by the end of the second month, and so on; competition for the contract makes it possible to have the benefits of exclusivity and rivalry simultaneously. Things work similarly in the newspaper business. Contract terms are short, so competition for the contract can flourish. Meanwhile, exclusive distribution of news or features through a single paper in a city helps the paper distinguish itself from, and compete with, its rivals. The *SunTimes* will not promote a readership for a particular columnist if the *Tribune* and the *Herald* carry the same column; free-riding would spoil the investment and thwart this aspect of competition.

█ Contracts in the news business, unlike those in the motion picture advertising business, are of indefinite duration, and either side may terminate after giving the required advance notice. According to the *Herald*, this makes all the difference, but we don't see why. A termination clause works just like a stated time limit in facilitating competition for the contract. The FTC did not insist that dealings between a distributor and a theater *cease* after a year; the parties were free to renew their arrangement for successive years; it was enough that there be an option to change distributors or renegotiate once a year. That option exists in the newspaper business. Both sides to these contracts enjoy an annual (or more frequent) right to negotiate new terms or change partners. To this the *Herald* responds, in essence: The contracts aren't terminated in fact, so the legal terms do not matter; the contracts should be treated as perpetual. Yet for all we can tell renewal was (and remains) the norm in the motion picture business. As long as arrangements serve the interests of both parties, they will continue, whether that means signing another in a series of one-year contracts or declining to exercise an annual option to cancel a contract. Enduring exclusive distribution contracts characterize markets that are recognized as competitive: for example, *Babylon 5* appears exclusively on WPWR–TV (Channel 50) in Chicago, and almost all other shows are exhibited exclusively on one channel per locale, sticking with that station for their entire original production run, even though no one thinks that individual stations or producers have market power. Cf. *Schurz Communications, Inc. v. FCC*, 982 F.2d 1043 (7th Cir.1992); *Capital Cities/ABC, Inc. v. FCC*, 29 F.3d 309 (7th Cir.1994). The FTC and the Supreme Court in *Motion Picture Advertising Service* wanted to ensure that dealings continued only while they remained in the interests of both distributors and theaters—which meant that someone else could come along with a better deal and get the business. Likewise someone with a better offer can get or sell news on short notice. The *Herald* has never tried to make a better offer, and we conclude that it has come to the wrong forum. It should try to outbid the *Tribune* and *Sun–Times* in the marketplace, rather than to outmaneuver them in court.

AFFIRMED.