**Opinion issued September 29, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00102-CV

_____

**REGAL ENTERTAINMENT GROUP, Appellant**

**V.**

**IPIC-GOLD CLASS ENTERTAINMENT, LLC AND IPIC TEXAS, LLC**
**Appellees**

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-68745**

---

# O P I N I O N

iPic-Gold Class Entertainment, LLC and iPic Texas, LLC (iPic), a boutique

upscale movie theater chain, sued Regal Entertainment Group and AMC, two large

theater chains, for alleged violations of Texas antitrust law. iPic alleges that Regal

violated the Texas Free Enterprise and Antitrust Act by requesting from major film

distributors a "clearance" for its Greenway Grand Palace 24 theater located near the iPic Houston theater.  In other words, Regal told major film distributors that the 24-screen, 5,000-seat Greenway would not play first-run films simultaneously, or "day-and-date", with the nearby 8-screen, 578-seat iPic Houston.  This, according to iPic, harms competition by preventing the iPic Houston from licensing films shown at the Greenway to play at the same time at the iPic Houston, thereby diminishing the quality of the iPic Houston's product.  iPic sought temporary injunctive relief, and the trial court entered a temporary injunction prohibiting Regal from requesting from any film distributor the right to exhibit films to the exclusion of iPic Houston.

On appeal, Regal argues that the trial court abused its discretion by entering the temporary injunction because iPic did not demonstrate (1) a probable right to relief on its claims or (2) probable, imminent, and irreparable injury.  We affirm.

**Background**

*iPic Houston opens and sues*

In November 2015, iPic opened a new 8-screen, 578-seat theater near River Oaks, an upscale Houston neighborhood.  According to iPic's CEO, Hamid Hashemi, and other iPic witnesses who testified at the temporary injunction hearing, iPic offers a different product—a "premium experience"—to moviegoers.  Hashemi testified that iPic Houston boasts several amenities that are unavailable at Regal's nearby Greenway and other major megaplexes:  reserved "pod" seating in leather

reclining seats, blankets, pillows, free popcorn, and wait service for those who order from iPic's full bar or from its food menu designed by a James Beard-award-winning chef. Hashemi also testified that the iPic experience carries a heftier price tag: iPic Houston's top ticket price is $28, while the Greenway's highest ticket price is in the range of $11.50.

iPic sued Regal and AMC during iPic Houston's opening month, alleging (1) unlawful restraint of trade under section 15.05(a) of the Texas Free Enterprise and Antitrust Act, (2) monopolization and attempted monopolization under section 15.05(b), and (3) tortious interference with contracts and business relationships. According to iPic's petition, in July 2014, more than a year before iPic Houston opened, Regal informed six major film distributors that Regal's Greenway theater, which is 1.4 miles from iPic Houston, would be "clearing" iPic Houston, meaning that Regal would not license a film to play at the Greenway if the distributor licensed the film to play simultaneously, or "day-and-date," at iPic Houston.

According to iPic, Regal's clearance request forces film distributors to choose between licensing a film to iPic Houston or the nearby Greenway, owned by Regal, contrary to distributors' ordinary incentive, which is to license films to play on the maximum number of screens possible. iPic also alleges that, as the country's largest movie exhibitor, Regal has the market power to force distributors to honor its clearance request. According to iPic's petition, Regal's clearance request not only

harms iPic but also the market for premium exhibition of first-run films by reducing the number of films that iPic Houston exhibits and thereby diminishing consumer choice in the premium movie exhibition market. iPic also alleges that iPic Houston cannot survive without access to the first-run films that form a core part of its product. iPic's petition requested temporary and permanent injunctions prohibiting Regal and AMC from clearing the iPic theaters in their respective areas and from conspiring with each other to do the same.[1]

*Temporary injunction hearing*

iPic executive Clark Woods testified that he learned about Regal's clearance request in July 2014. According to Woods, Regal called six major distributors to inform them that its Greenway theater would not play films day-and-date with iPic Houston. The films distributed by these six distributors account for 90% of box office revenues. Woods testified that these distributors responded in different ways—three offered their films to both the Greenway and iPic Houston notwithstanding the request, while the other three effectively honored the request by

---

[1]    iPic's petition alleges that AMC contacted the same six distributors and informed them that AMC's megaplex in Frisco, Texas would be clearing iPic's planned theater in Frisco. iPic alleges, based on the timing of Regal and AMC's communications with distributors, that Regal and AMC conspired to drive iPic theaters out of business. These allegations notwithstanding, the temporary injunction does not mention AMC, and AMC is not a party to this appeal. Accordingly, we confine our analysis to the claims asserted against Regal.

"allocating" their films between the Greenway and iPic Houston.[2] Woods testified that the allocating distributors reported that they were allocating to avoid having Regal "boycott" or refuse to play their films at the Greenway.

Woods testified that Regal's clearance harms consumers as well as itself. According to Woods, iPic had been able to license every film it wanted at its other 12 theaters, but was unable to license some films in Houston due to Regal's clearance request. Houston consumers are therefore unable to see certain films in a premium theater setting.

Woods and iPic's CEO, Hamid Hashemi, who also testified at the hearing, emphasized that iPic Houston and the Greenway are different types of theaters with different markets. In addition to highlighting iPic's upscale amenities, both compared the theaters' ticket prices: Woods testified that the average price of an iPic ticket is $21 to $28, while the average ticket price at a mainstream megaplex is $9. They also testified that iPic attracts older consumers, who do not patronize mainstream theaters and can more easily absorb the higher cost of iPic tickets. The upshot of these differences is that the Greenway and iPic Houston offer different products and do not substantially compete with each another. iPic's consultant on clearances, Paul Springer, echoed these themes, testifying that the two theaters do

---

2       Allocation is the process by which distributors choose, in the context of a clearance, to license some films to one theater and other films to the other.

not substantially compete. iPic's antitrust expert, Frederick Warren-Bolton, likewise testified that the percentage of people who view the Greenway and the iPic Houston as interchangeable is "de minimis" and "the crossover is very, very small." Warren-Boulton also testified about other factors to be considered under the rule of reason. He testified that Regal has market power in the relevant geographic market sufficient to harm competition and that Regal's clearance has, in fact, harmed competition. Warren-Boulton testified that Regal's clearance reduced distributors' revenue. In particular, he pointed to an email in which Regal told distributors that allocating certain films to iPic Houston "resulted in significant revenue loss for both distribution and Regal." Warren-Boulton also testified that consumers are harmed if they cannot see a film at iPic Houston, because the moviegoing experience at the Greenway is not a "close substitute[]."

With respect to iPic Houston's damages, iPic presented the testimony of Hashemi to the effect that there is "no way . . . to measure what [iPic's] losses are," because there is no way to know how many customers would have seen movies that iPic Houston was unable to show, and no way to measure how many customers iPic would not be able to "bring . . . back" once its reputation has been damaged.

Regal also presented evidence at the hearing. Amy Miles, its CEO, testified that the Greenway/iPic Houston clearance is consistent with Regal's nationwide policy, which is to clear any competing theaters within three miles of a Regal theater,

6

even if it is another Regal-owned theater.  Miles testified that there are 70 Regal theater clearance zones nationwide, although the others are mutually agreed. Miles testified that clearances yield pro-competitive benefits:  they increase film supply and ensure that different films get played.

Michael Viane, Regal's senior vice-president and head film-buyer, likewise testified that clearance zones result in the exhibition of a greater diversity of films and the exhibition of films for longer periods of time. Viane discounted the notion that iPic Houston had been harmed by the Greenway/iPic Houston clearance:  he testified that iPic Houston licensed several high-performing films that were not licensed to the Greenway in the two months iPic Houston was open before the temporary injunction was entered.  Viane cited *Star Wars: The Force Awakens* and *Spectre*, two box office hits, as examples of films that played at iPic Houston and not the Greenway.

Regal presented two expert witnesses.  Mark Israel, a competition economist, opined that Regal's conduct was not anticompetitive and does not render iPic Houston incapable of competing for films or customers.  His analysis showed that the Greenway lacks sufficient market power to exclude iPic Houston from the market for film licenses, as evidenced by the fact that the iPic Houston has licensed multiple sought-after box office hits and become one of the top performing iPic theaters in the country despite the clearance.

7

Rajiv Gokhale addressed harm, echoing Viane's testimony that iPic Houston had not suffered any harm from Regal's clearance request. Gokhale pointed out that iPic Houston was performing above iPic expectations and ranked second among all iPic theaters in dollar amount of box office gross per theater, third in gross per screen, and fourth in gross per seat. Gokhale also testified that harm to iPic, if any, could be quantified through the use of financial models, particularly with the additional financial data that would become available before trial.

At the close of the hearing, the trial court orally granted the temporary injunction. The trial court's written temporary injunction order, among other things, prohibited Regal from:

> directly or indirectly, demanding or requesting exclusive film licenses or the right to exhibit films from any studio to the exclusion of [iPic's] Houston theater; indicating to a studio that such defendant will refuse to play a film at any of its theaters if the studio licenses the film for exhibition at the iPic Houston, or carrying out such refusal[.]

Regal appealed.

### Standard of Review

To obtain a temporary injunction, the applicant must plead and prove: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *TMC Worldwide, L.P. v. Gray*, 178 S.W.3d 29, 36 (Tex. App.—Houston [1st Dist.] 2005, no pet.). The decision to grant

8

or deny a temporary injunction lies in the sound discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of discretion. *Butnaru*, 84 S.W.3d at 204. "Our review of the trial court's decision is limited to the validity of its temporary injunction order; we do not consider the merits of the underlying case." *Intercontinental Terminals v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 892 (Tex. App.— Houston [1st Dist.] 2011, no pet.).

"Probable right to relief" is a term of art in the injunction context. *Id.* at 897. "To show a probable right to recover, an applicant need not show that it will prevail at trial. Nor does a finding of probable right of recovery indicate a trial court's evaluation of the probability that the applicant will prevail at trial." *Id.* (citing *Butnaru*, 84 S.W.3d at 211 (demonstrating probable right to relief does not require establishing that applicant will prevail on final trial)); *see DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 686 (Tex. 1990) (injunction plaintiff "need not establish the correctness of his claim to obtain temporary relief").

"Instead, to show a probable right of recovery, the applicant must plead a cause of action and present some evidence that tends to sustain it," meaning that "[t]he evidence must be sufficient to raise a bona fide issue as to the applicant's right to ultimate relief." *Intercontinental Terminals*, 354 S.W.3d at 897 (first citing *Camp v. Shannon*, 348 S.W.2d 517, 519 (Tex. 1961), then citing *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 23–24 (Tex. App.—Houston [1st

9

Dist.] 1998, pet. dism'd), then citing *183/620 Group Joint Venture v. SPF Joint Venture*, 765 S.W.2d 901, 904 (Tex. App.—Austin 1989, writ dism'd w.o.j.)) (internal quotations omitted). Because the entry of a temporary injunction does not indicate that the applicant will prevail at trial, the applicant who obtains one must post a bond "to protect the defendant from the harm he may sustain as a result of temporary relief granted upon the reduced showing required of the injunction plaintiff, pending full consideration of all issues." *DeSantis*, 793 S.W.2d at 686; *see* TEX. R. CIV. P. 684 (temporary injunction applicant must file bond payable to adverse party in event injunction dissolved).

In reviewing an order granting or denying a temporary injunction, we draw all legitimate inferences from the evidence in a manner most favorable to the trial court's order. *See Butnaru*, 84 S.W.3d at 204; *Gray*, 178 S.W.3d at 36 (citing *CRC–Evans Pipeline Int'l v. Myers*, 927 S.W.2d 259, 262 (Tex. App.—Houston [1st Dist.] 1996, no writ)). A trial court does not abuse its discretion if it heard conflicting evidence, and evidence appears in the record that reasonably supports the trial court's decision. *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *see Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009).

When reviewing a temporary injunction where findings of fact were not requested or filed, we imply all findings that would support the trial court's order unless there is no evidence to support such a finding and affirm if the order can be

10

upheld on any legal theory that finds support in the evidence. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). If the judgment can be upheld on any legal theory supported by the evidence, "[w]e must uphold the judgment regardless of whether the trial court articulates the correct legal reason for the judgment." *Conseco Fin. Servicing Corp. v. J & J Mobile Homes, Inc.*, 120 S.W.3d 878, 880–81 (Tex. App.—Fort Worth 2003, pet. denied).

## Applicable Law

The Texas Free Enterprise and Antitrust Act of 1983 provides that "[e]very contract, combination, or conspiracy in restraint of trade or commerce is unlawful." TEX. BUS. & COM. CODE § 15.05(a). The purpose of the Act is to maintain and promote competition in trade and commerce within Texas and to provide the benefits of that competition to Texas consumers. *Id.* § 15.04. We construe the Act "in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with this purpose." *Id.*; *see also Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 688–89 (Tex. 2006). Texas caselaw applying the Act is limited, and, accordingly, we rely heavily on the jurisprudence of the federal courts applying the Sherman Antitrust Act. *Harmar Bottling*, 218 S.W.3d at 688–89; *see DeSantis*, 793 S.W.2d at 687 (Texas courts do not write on a clean slate but rather look to federal judicial interpretations of section 1 of Sherman Act in applying section 15.05(a) of our state antitrust law); *see also* 15 U.S.C. § 1 (declaring

11

illegal"[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States. . . .").

The Texas Free Enterprise and Antitrust Act does not prohibit all restraints of trade; it prohibits only unreasonable restraints of trade that have an adverse effect on competition in the relevant market. *Winston v. Am. Med. Int'l*, 930 S.W.2d 945, 951–52 (Tex. App.—Houston [1st Dist.] 1996, writ denied); *see also Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723, 108 S. Ct. 1515, 1519 (1988). When the allegedly anticompetitive conduct is a vertical nonprice restraint, such as a clearance, we evaluate it under the rule of reason. *Business Elecs. Corp.*, 485 U.S. at 723; *see also Red Wing Shoe Co., Inc. v. Shearer's, Inc.*, 769 S.W.2d 339, 343 (Tex. App.—Houston [1st Dist.] 1989, no pet.) (vertical nonprice restraints are evaluated under rule of reason); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1371 (3rd Cir. 1996) (clearances are vertical, nonprice restraints evaluated under rule of reason); *Cobb Theatres III, LLC v. AMC Entmt. Holdings, Inc.*, 101 F. Supp. 3d 1319, 1332 (N.D. Ga. 2015) (alleged clearance agreement between premium theater and distributor is vertical agreement scrutinized under rule of reason).

To establish a violation of section 15.05(a) of the Act under the rule of reason, a plaintiff must show (1) a contract, combination, or conspiracy (2) that had an adverse effect on competition (3) in a relevant market. *See Business Elecs.*, 485 U.S. at 723, 108 S. Ct. at 1518–19; *DeSantis*, 793 S.W.2d at 687. To prove a contract,

combination, or conspiracy in restraint of trade, the plaintiff must show some kind of "common design and understanding, or a meeting of minds in an unlawful arrangement." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Assn.*, 776 F.3d 321, 330 (5th Cir. 2015) (citing *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S. Ct. 1125, 1139 (1946)); *see also Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 761, 104 S. Ct. 1464, 1469 (1984). And a plaintiff may demonstrate the existence of a conspiracy with evidence that a party took action based upon the antitrust defendant's economic threat. *See Abraham & Veneklasen*, 776 F.3d at 330; *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 221 (5th Cir. 2001) (antitrust law "implicitly recognizes that an integral part of a boycott is often bringing pressure to bear ('persuading or coercing') on other participants who have no direct motive to restrain trade").

To prove that competition in the relevant market was adversely affected, a plaintiff must define the relevant market—which has both geographic and product components—and prove that a defendant has market power in that market. *See Business Elecs.*, 485 U.S. at 725, 108 S. Ct. at 1520; *Jacobs v. Tempur–Pedic Int'l, Inc.*, 626 F.3d 1327, 1336 (11th Cir. 2010); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 625–26 (5th Cir. 2002); *Cobb Theatres*, 101 F. Supp. 3d at 1335; *DeSantis*, 793 S.W.2d at 688. The relevant product market is "determined by the availability of substitutes to which consumers can turn in response to price increases

and other existing or potential producer's ability to expand output." *Cobb Theatres*, 101 F. Supp. 3d at 1336 (citing *L.A. Draper & Son v. Wheelabrator–Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984)). The relevant geographic market is defined as the area in which consumers may obtain a given product. *Apani*, 300 F.3d at 625; *Cobb Theatres*, 101 F. Supp. 3d at 1336 (citing *L.A. Draper*, 735 F.2d at 423). The parameters of the geographic and product markets are questions of fact. *Cobb Theatres*, 101 F. Supp. 3d at 1335 (citing *Thompson v. Metro. Multi–List, Inc.*, 934 F.2d 1566, 1573 (11th Cir. 1991)).

When determining whether two products are in the same product market, the factfinder should consider cross-elasticity on both the demand side—the degree to which consumers consider the products to be substitutes—and the supply side—how easily and costlessly a party can sell the same product as the other. *See Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995); *see also* IIB Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 561, at 378 (4th ed. 2014) ("Two products . . . are in the same relevant market if substitutability at the competitive price is very high as measured from either the demand side or the supply side."). The factfinder considers "the uses to which the product is put by consumers in general," *Jacobs*, 626 F.3d at 1337, and gives "special consideration 'to evidence of the cross-elasticity of demand and reasonable substitutability of the products . . . .'" *Cobb Theatres*, 101 F. Supp. 3d at 1336 (quoting *Jacobs*, 626 F.3d at 1337–38); *see*

*Apani*, 300 F.3d at 626 (in ascertaining relevant product market, factfinder considers extent to which seller's product is interchangeable in use and degree of cross-elasticity of demand between product and substitutes).

To satisfy the rule of reason, "[t]here must be evidence of 'demonstrable economic effect,' not just an inference of *possible* effect." *Harmar Bottling*, 218 S.W.3d at 689 (quoting *Business Elecs.*, 485 U.S. at 724, 108 S. Ct. at 1519). And the rule of reason condemns only those restraints that actually have an adverse effect on competition in a market, as opposed to merely hurting a competitor. *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 688, 98 S. Ct. 1355, 1363 (1978). In other words, a plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury. *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991); *see Marlin v. Robertson*, 307 S.W.3d 418, 425 (Tex. App.—San Antonio 2009, no pet.). But an antitrust plaintiff may satisfy his burden to show an adverse effect on competition "by proving the existence of actual anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services." *Orson*, 79 F.3d at 1367.

## Analysis

### A. "Substantial competition" does not displace rule of reason

We address first Regal's contention that the trial court erroneously disregarded the rule of reason and granted injunctive relief solely on the basis of its

15

oral finding that the Greenway and the iPic Houston are not in "substantial competition." In *United States v. Paramount Pictures*, 334 U.S. 131, 68 S. Ct. 915 (1948), the United States Supreme Court recognized that a clearance could be a lawful means to protect an exhibitor's investment in a film license if the clearance was not "unduly extended as to area or duration," and affirmed the injunction of a clearance between two theaters that were not in "substantial competition" where the clearance lacked relation to competitive factors which could justify it. 334 U.S. at 146–47, 68 S. Ct. at 924. Since *Paramount*, courts evaluating clearances have considered whether theaters are in "substantial competition" as part of the rule of reason analysis. *See, e.g.*, *Orson*, 79 F.3d at 1371–72 (first determining that theaters were in "substantial competition" and then analyzing competitive effects of clearance); *Theee Movies v. Pacific Theatres, Inc.*, 828 F.2d 1395, 1399 (9th Cir. 1987) (analyzing clearance under rule of reason and noting "[c]ourts have found clearances in particular to be reasonable restraints of trade . . . when the theaters are in substantial competition"); *Cobb Theatres*, 101 F. Supp. 3d at 1333 (courts evaluating clearances consider whether theaters are in "substantial competition" and clearance's positive and negative effects on competition).

Whether theaters are in substantial competition turns on whether they sell a reasonably interchangeable product in the same geographic area. *See Theee Movies*, 828 F.2d at 1399 (noting district court properly found two theaters to be in

16

substantial competition where they were "located on the same major thoroughfare only a short distance apart," and drew patrons from the same area); *Orson*, 79 F.3d at 1365 (two "art house" theaters located in Center City Philadelphia were in "substantial competition"). Thus, although a "substantial competition" inquiry cannot displace a rule of reason analysis, the factors that determine whether substantial competition exists are necessarily considered in evaluating a clearance under the rule of reason. *See Orson*, 79 F.3d at 1372; *Theee Movies*, 828 F.2d at 1399; *Cobb Theatres*, 101 F. Supp. 3d at 1334. Accordingly, the trial court did not err in considering, as part of its rule of reason analysis, whether iPic Houston and the Greenway are in substantial competition.

Additionally, even if, as Regal argues, the trial court applied an incorrect standard or misplaced the burden of proof, the applicable standard of review requires us to uphold the trial court's order if the record supports upholding it under the correct legal theory. *See BMC Software*, 83 S.W.3d at 795. We therefore turn to whether the trial court could have found iPic had a probable right to relief on each element of its restraint-of-trade claim under the proper legal standard, the rule of reason.

**B.    Probable right to relief on restraint-of-trade claim under rule of reason**

In its first issue, Regal contends that the trial court erred in entering the temporary injunction because iPic did not demonstrate a probable right to relief on

its unlawful restraint-of-trade claim under the correct legal standard, the rule of reason. In particular, Regal argues that iPic did not adduce sufficient evidence to support findings of (1) a contract, combination, or conspiracy (2) having an adverse effect on competition (3) in a relevant market. We address each of these elements in turn.

### 1. Contract, combination, or conspiracy

The evidence at the temporary injunction hearing showed that, before iPic Houston opened, Regal contacted six major film distributors to request a Greenway/iPic Houston clearance. Three responded by allocating films between the two theaters, licensing some films only to the iPic Houston and others only to the Greenway. iPic executives, Hashemi and Woods, testified that these allocating distributors told iPic they would have licensed films to the iPic Houston but for Regal's clearance request.

Although the other three distributors did not allocate, and instead offered to license films to both theaters, Regal declined to have the Greenway exhibit any film these distributors licensed to the iPic Houston. And there was evidence that Regal pointed out to these distributors that licensing films to the iPic Houston and not the Greenway was costing the distributors revenue.

Regal contends that this evidence is "as consistent with permissible competition as with illegal conspiracy" and thus, does not constitute evidence from

which a conspiracy as opposed to independent conduct may be inferred. *See Abraham & Veneklasen*, 776 F.3d at 330. In particular, Regal argues that the record shows merely that it unilaterally requested a clearance and each distributor exercised its own independent business judgment in determining whether to honor the request. But antitrust law "implicitly recognizes that an integral part of a boycott is often bringing pressure to bear ('persuading or coercing') on other participants who have no direct motive to restrain trade." *Spectators' Commc'n*, 253 F.3d at 221.

Here, the evidence showed that film distributors were incentivized against allocation, yet three allocated against their self-interest and reported to iPic that they did so because of Regal's request. Likewise, Regal's costly decision not to have the Greenway play *Star Wars: The Force Awakens*, because it was offered to iPic Houston, was inconsistent with Regal's self-interest. The evidence that Regal and half of the major film distributors acted contrary to their self-interest is what permits a rational inference of conspiracy or coercion as opposed to permissible independent conduct. *See Admiral Theater Corp. v. Douglas Theater Co.*, 585 F.2d 877, 884 (8th Cir. 1978) (when conduct is inconsistent with self-interest of actors, were they acting alone, agreement may be inferred solely from action); *cf. Abraham & Veneklasen*, 776 F.3d at 330 (reversing judgment based on jury verdict where evidence showed that actors' independent financial incentives and ethical concerns could have motivated defendants' conduct); *see also Cobb Theatres*, 101 F. Supp. 3d at 1331

(noting that most conspiracies are inferred from behavior of alleged conspirators and denying motion to dismiss restraint-of-trade claim where premium theater alleged that megaplex requested clearance, implicitly threatening economic harm if distributors did not accede, and premium theater subsequently received fewer films).

Accordingly, we conclude that iPic adduced some evidence from which the trial court could have inferred the existence of a conspiracy or coercion. *See Admiral Theater Corp.*, 585 F.2d at 884; *Spectators' Commc'n*, 253 F.3d at 221; *Cobb Theatres*, 101 F. Supp. 3d at 1331. Therefore, the trial court did not abuse its discretion in impliedly finding that iPic raised a bona fide issue with respect to the first element of its restraint-of-trade claim. *Intercontinental Terminals*, 354 S.W.3d at 897 (to show probable right to relief, applicant must adduce evidence sufficient to raise a bona fide issue as to applicant's right to ultimate relief); *Davis*, 571 S.W.2d at 862 (in reviewing temporary injunction, appellate court views evidence in light most favorable to trial court's resolution of conflicting evidence).

2. *Relevant markets*

a. The product markets

The parties agree that there is more than one relevant product market. They also agree that they both participate in the first of these product markets—the market for film licenses. In this market, both the Greenway and iPic Houston compete to purchase film licenses from film distributors.

20

The parties disagree and presented conflicting evidence about a second relevant product market in which iPic Houston and Regal are sellers: the market for film exhibition in which moviegoers are the buyers. Regal argues that the Greenway and iPic Houston both operate in the same market—the market for first-run film exhibition. For its part, iPic contends that it participates in a distinct first-run film exhibition market—the market for *premium* exhibition of first-run films—to the exclusion of the Greenway and megaplexes generally.

When determining whether two products are in the same market, the factfinder should consider cross-elasticity on both the demand side and the supply side. *See Rebel Oil*, 51 F3.d at 1436. In other words, the factfinder considers the extent to which the products are interchangeable from the perspective of consumers. *Id*. It also considers interchangeability from the supply side, asking how easily and costlessly one party could sell the same product as the other. *Id*.; *see also Apani*, 300 F.3d at 626.

In support of its contention that the Greenway and iPic Houston compete in the same first-run film exhibition market, Regal adduced evidence that an internal iPic report prepared in advance of iPic Houston's opening referenced the Greenway and other Houston megaplexes as competitors. Regal also adduced evidence that iPic parked a van advertising the iPic Houston in front of the Greenway to lure Greenway patrons to the iPic Houston. Regal argues that the trial court should have

credited this evidence as demonstrating cross-elasticity in both supply and demand between the Greenway and the iPic Houston and concluded that both theaters participate in the same film exhibition market—the market for display of first-run films. *See Apani*, 300 F.3d at 626; *see also Rebel Oil*, 51 F.3d at 1435 ("If consumers view the products as substitutes, the products are part of the same market.").

iPic's witnesses testified that the iPic Houston offers a different product to consumers than the Greenway—a luxury film-watching experience in which iPic's unique amenities are integral. iPic presented evidence that iPic Houston was the only theater of its kind in Houston, targeting a different demographic, and charging twice or more the price of the average ticket at the Greenway for its premium plus seats, which comprise 60% of the total number of seats at iPic Houston.

With respect to cross-elasticity of demand, Warren-Boulton acknowledged that some moviegoers might choose to go to either the Greenway or the iPic, but he opined that they "are not close substitutes," and the amount of consumers who treat the two as interchangeable is "de minimis" because of the difference in both price and quality of experience. *See Apani*, 300 F.3d at 626; *Rebel Oil*, 51 F.3d at 1435. Regarding the supply side, Hashemi testified that iPic invested over $10 million in the build-out of iPic Houston, which included the construction of the pod seating and a full kitchen and bar. iPic also invested a significant sum in the training of over 200 employees to operate the theater and its bar and food service. And Miles

acknowledged that converting a mainstream theater to one with VIP amenities was costly. *See Rebel Oil*, 51 F.3d at 1436 (cross-elasticity of supply is shown when sellers can readily, with ease and low cost, switch to selling what other is selling).

Thus, although the parties adduced conflicting evidence, there was some evidence that the trial court could have credited to conclude that the two theaters offer consumers distinct products that are not reasonably interchangeable from consumers' perspective. *See FTC v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1039 (D.C. Cir. 2008) ("premium natural and organic supermarkets" operate in distinct product market where they target distinct customers paying distinct prices for a particular shopping experience they found "uniquely attractive"); *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 183 (3d Cir. 2015) (full-service supermarkets plausibly in distinct product market from traditional grocery suppliers where they provide one-stop shopping experience including prepared foods, on-site dining, wine and liquor, and specialty products not sold in traditional grocery suppliers), *cert. denied*, 2016 WL 1046885 (2016)).

Likewise, there was some evidence that the trial court could have credited to conclude that the theaters were not cross-elastic on the supply side. *See Rebel Oil*, 51 F.3d at 1436. Although the trial court could have credited either side's evidence, having found some evidence supporting the trial court's implied fact-finding that the Greenway and the iPic Houston participate in distinct first-run film exhibition

markets, i.e., that iPic Houston participates in the market for *premium* exhibition of first-run films to the exclusion of the Greenway, we must defer to that finding on appeal. *See Davis*, 571 S.W.2d at 862 (appellate court defers to trial court's credibility judgments and resolution of conflicting evidence when reviewing temporary injunction order); *Cobb Theatres*, 101 F. Supp. 3d at 1335 (citing *Thompson*, 934 F.2d at 1573) (parameters of relevant product market is question of fact).

> b. The geographic market

Because we have concluded that iPic adduced some evidence to support a finding that the two theaters operate in distinct first-run film exhibition product markets, we next consider the geographic scope of the product market in which the two theaters do compete and in which Regal allegedly used its power to harm competition—the market for first-run film licenses.

Regal asserts that the geographic market for first-run film licensing is coextensive with the first-run film exhibition market and far broader than the Greenway zone, which is the area within a 3-mile radius of the Greenway. Specifically, Regal points to its expert's opinion that the geographic market for first-run film exhibition spans 10 miles from the Greenway, as evidenced by proof that a substantial percentage of moviegoers divert to theaters outside the Greenway zone if the Greenway does not play a particular film. It argues that the trial court

disregarded its proof of eight other commercial first-run theaters within this larger area. Regal asserts that when all theaters in this broader geographic market are considered, the Greenway's market share is only 12–16%, which is insufficient to show market power.

For its part, iPic contends that a detailed inquiry into the geographic market for film licenses is unnecessary because it demonstrated actual harm to competition. *See Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir. 2000) ("The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects."). Alternatively, iPic asserts that it adduced sufficient evidence of a geographic market coextensive with the Greenway zone, in which Greenway has only one competitor—iPic Houston—for the purchase of film licenses.

iPic's expert, Warren-Boulton, testified that the relevant market for film licenses was "a very, very narrow small market" approximating the 3-mile Greenway zone, although he acknowledged that the Greenway draws customers from up to five to seven miles away. iPic also relies, in support of its proposed geographic market, on the proof that Regal and AMC's clearance policies extend only to theaters in close proximity, within 3 miles. Finally, iPic points out that the Greenway does not clear any theater other than the iPic Houston, and that no other theater clears the Greenway or the iPic Houston. According to iPic, this evidence is

25

sufficient to show that no other theater impacts the Greenway's or the iPic Houston's film licensing.

When determining the geographic market, the factfinder may consider economic and physical barriers to expansion such as customer convenience and preference. *Cobb Theatres*, 101 F. Supp. 3d at 1336. Markets involving services that can only be offered from a particular location, such as theaters, are often defined by how far consumers are willing to travel. *Id.* Regal proved that moviegoers diverted to other megaplexes in substantial numbers when the Greenway did not exhibit a film, but did not adduce evidence that such diversion indicates the existence of competition between the Greenway and those megaplexes in the film licensing market. iPic offered expert and other evidence to support a narrower geographic market for film licenses than Regal posits. In short, although the parties offered conflicting evidence, the trial court could have concluded that the geographic market spans, roughly, an area contiguous with the 3-mile range iPic posited, with Regal's resulting market share being sufficient to bespeak market power. *See id.* (allegation of geographic market consisting of "Buckhead-Brookhaven film licensing zone" comprised of moviegoers who reside in or around Buckhead and Brookhaven sufficient to withstand motion to dismiss despite defendants' claim that market should not be so narrowly drawn as to exclude various nearby theaters). Although reasonable minds could reach different conclusions, because the record supports the

26

trial court's implied finding of a properly defined geographic market, we do not disturb the finding on appeal. *Davis*, 571 S.W.2d at 862 (appellate court defers to trial court's credibility judgments and resolution of conflicting evidence when reviewing temporary injunction order); *see also Butnaru*, 84 S.W.3d at 204.

### c. Market power

Regal argues that the trial court's implied finding that Regal has market power sufficient to harm competition is unsupported by the record because Regal held only 12–16% of the market share in the market for film licenses, and therefore lacked power to inflict competitive harm. This assumes the trial court adopted Regal's definition of the relevant geographic market. iPic asserts that the decision by some distributors to allocate films between the theaters is itself proof of Regal's market power sufficient to support the temporary injunction.

Market power may be shown in different ways, including by proof of power to exclude competition. *See Cohlmia v. St. John Med. Ctr.*, 693 F.3d 1269, 1282 (10th Cir. 2012) (proof of market power requires evidence of either power to control prices or to exclude competition). Here, the evidence showed that the Greenway has over 5,000 seats, outnumbering the iPic Houston's seats by almost ten times. It is undisputed that the Greenway's relative size gives it the capacity to generate more total revenue for distributors than the iPic. Viane, Regal's head film-buyer, told the

27

distributors as much, emphasizing that distributors who licensed films to iPic Houston instead of the Greenway lost revenue.

There was also evidence from which the trial court could conclude that Regal's clearance request was the but-for cause of the allocating distributors' decisions not to license films to iPic Houston—iPic witnesses testified that those distributors said as much. And Warren-Boulton testified that Regal's ability to convince distributors to allocate films between the two theaters demonstrated that Regal had market power. *See Cohlmia*, 693 F.3d at 1282 (market power requires "evidence of either power to control prices or the power to exclude competition").

Regal argues that the record contains conflicting evidence negating market power. It emphasizes that three of the major film distributors denied its clearance request and that iPic Houston was able to secure desirable films from the allocating distributors. This evidence demonstrates only that Regal's market power is not unfettered. Because some evidence supports the trial court's resolution of the conflicting evidence to find that Regal has sufficient market power to restrain, in part, iPic's ability to obtain film licenses, we cannot disturb its implied finding on appeal. *See Davis*, 571 S.W.2d at 862; *Butnaru*, 84 S.W.3d at 204; *see also Intercontinental Terminals*, 354 S.W.3d at 897 (stating that "[t]he evidence must be sufficient to raise 'a bona fide issue [ ] as to [the applicant's] right to ultimate relief.'").

*3.      Harm to competition*

Regal contends that iPic was required but failed to show substantial harm to competition market-wide.  Relying on *Coca-Cola Company v. Harmar Bottling Company*, 218 S.W.3d 671 (Tex. 2006), Regal asserts that iPic, at most, showed that it occasionally failed to secure licenses for particular films, which is insufficient. 218 S.W.3d at 688 (isolated instances that impacted consumers through reduced choices insufficient absent showing of market-wide harm to competition).  iPic counters that it met its burden to show harm by demonstrating a reduction in output in both product markets.  *See Orson*, 79 F.3d at 1367 (antitrust plaintiff satisfies his burden to show anticompetitive effects with evidence of reduction of output or deterioration in quality of goods and services).

iPic adduced some evidence that Regal's clearance request reduced the number of films that iPic Houston was able to exhibit.  Woods testified that Regal's clearance request resulted in the iPic Houston showing fewer films than it wanted to show—only 12 during the period in which every other iPic theater exhibited 21 to 30.  Hashemi testified that this constraint on iPic Houston's ability to obtain film licenses, in turn, reduced the quality of the product available to Houston consumers in the market for premium exhibition of first-run films.  This is sufficient under *Orson*. *Id*.

Regal contends that *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42 (7th Cir. 1996), and *Harmar Bottling* compel a different conclusion. But neither of these cases involved distinct secondary product markets. *See Paddock Publ'n*, 103 F.3d at 44 (plaintiff and defendants all participated in general-interest newspaper market); *Harmar Bottling*, 218 S.W.3d at 675 (relevant product market was market for carbonated soft drinks). Here, the trial court implicitly found that iPic Houston participates in the premium film exhibition market to the exclusion of the Greenway, and the evidence is sufficient to support the trial court's implied finding that Regal's clearance request reduced the number of first-run films available to consumers in that market. *See Orson*, 79 F.3d at 1367 (antitrust plaintiff satisfies burden to show anticompetitive effects with evidence of reduction of output or deterioration in quality of goods and services); *Harmar Bottling*, 218 S.W.3d at 688 (adverse impact on output or choice in market is evidence of market-wide harm); *see also Cobb Theatres*, 101 F. Supp. 3d at 1335 (allegation that clearance of premium movie theater by megaplex forced consumers to purchase product that was less desirable and of inferior quality adequately alleged harm to competition). Accordingly, we hold that iPic adduced some evidence that Regal's conduct harmed the market for premium exhibition of first-run films, and we therefore must defer to

the trial court's implied finding.[3]  *See Butnaru*, 84 S.W.3d at 204; *Intercontinental Terminals*, 354 S.W.3d at 897.

We overrule Regal's first issue.

## C.    **Probable, imminent, and irreparable injury**

In its second issue, Regal contends that the trial court erred in granting temporary injunctive relief because iPic did not adduce sufficient evidence that it would suffer probable, imminent, and irreparable injury without it.  In particular, Regal contends that iPic failed to show an imminent, actual injury or that any injury was irreparable.

### 1.    *Threat of imminent, actual injury*

Woods and Hashemi testified that iPic Houston was unsuccessful in licensing several films due to Regal's clearance request.  Hashemi also testified that customers in the premium first-run film exhibition market expect that a premium first-run film exhibitor would play those movies, that the iPic Houston's reputation and goodwill is dependent upon being able to offer these movies, and that the clearance therefore negatively affected the iPic's reputation and ability to deliver the experience consumers expected.  Woods testified along the same lines, adding that Regal's

---

[3]    Because we have concluded that the trial court did not abuse its discretion in concluding that iPic demonstrated a probable right to relief on its unlawful restraint-of-trade claim, and that claim is sufficient to support the temporary injunction, we do not address Pic's three other claims—monopolization, attempted monopolization, and tortious interference with contracts and prospective business relationships.

31

clearance was having a "direct impact [on] our long-term viability." This evidence would permit the trial court to conclude that iPic would suffer imminent harm if Regal's conduct was not enjoined. *See Intercontinental Terminals*, 354 S.W.3d at 895 (evidence that defendant's actions were causing loss of goodwill and reputation was evidence of imminent actual injury).

Regal contends it demonstrated that the clearance did not threaten imminent harm. For example, Regal emphasizes that iPic Houston was exceeding performance projections and outperforming other iPic theaters. Regal points out that, far from leaving only leftovers for iPic Houston, it was the Greenway that played several films only after iPic passed.

Although the record contains conflicting evidence regarding whether iPic Houston would suffer imminent harm absent an injunction, we may not disturb the trial court's resolution of conflicting evidence. The trial court was free to choose which evidence to credit and discredit, and we must view the evidence in the light most favorable to its ruling. *See Butnaru*, 84 S.W.3d at 204; *Davis*, 571 S.W.2d at 862. Accordingly, we hold that the trial court did not abuse its discretion in concluding that Regal's clearance threatened imminent injury to iPic.

2. *Irreparable injury*

Regal also contends that iPic did not demonstrate that any harm threatened would be irreparable. As discussed above, some evidence adduced by iPic pertained

32

to harm to iPic Houston's goodwill and reputation. "While [goodwill and reputational injuries] are not categorically irreparable, the irreparable injury requirement is satisfied when injuries of this nature are difficult to calculate or monetize." *Intercontinental Terminals*, 354 S.W.3d at 895; *see also Butnaru*, 84 S.W.3d at 204.

Hashemi testified that there was "no way . . . to measure what [iPic's] losses are," because there was no way to know how many customers would have been drawn to particular movies that the iPic was unable to show, and no way to measure how many customers the iPic would not be able to "bring . . . back" once it earned a reputation for showing lesser-quality films.

Regal contends that the trial court could not have concluded that any imminent harm to iPic would be irreparable because Regal's expert, Gokhale, testified that the harm to iPic, if any, could be calculated with a reasonable degree of certainty using iPic's internal performance benchmarks. While the parties adduced conflicting evidence, the trial court was not required to accept Gokhale's testimony. It could have concluded that at least some of the harm that iPic would suffer was reputational—an injury to its goodwill—and irreparable. *See, e.g.*, *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009, pet. ref'd) ("Disruption to a business can be irreparable harm. Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele,

33

goodwill, marketing techniques, and office stability, among others, is not easy.") (internal citations omitted)); *T–N–T Motorsports*, 965 S.W.2d at 24 (affirming temporary injunction based on testimony that lost goodwill would be "immeasurable"); *Intercontinental Terminals*, 354 S.W.3d at 896 (trial court was free to credit testimony of plaintiff's general manager that it would be "extremely difficult" to calculate harm to plaintiff's business reputation and discredit defendant's damage expert's testimony that the harm was quantifiable). Viewing the evidence in the light most favorable to the trial court's ruling, we hold that the trial court did not abuse its discretion in finding that the imminent harm with which iPic was threatened would be irreparable.

In sum, we hold that the trial court did not abuse its discretion in concluding that iPic demonstrated a probable, imminent, and irreparable injury.

We overrule Regal's second issue.

## Conclusion

We affirm the trial court's temporary injunction order.

Rebeca Huddle
Justice

Panel consists of Justices Keyes, Brown, and Huddle.

34