**Opinion issued June 13, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

————————————

## NO. 01-22-00282-CV

————————————

**BRYCE CARPENTER, Appellant**

**V.**

**DASPIT LAW FIRM, PLLC, Appellee**

---

**On Appeal from the 189th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-13046**

---

## MEMORANDUM OPINION

In this interlocutory appeal,[1] appellant, Bryce Carpenter, challenges the trial

court's order granting appellee, Daspit Law Firm, PLLC ("DLF"), a temporary

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4).

injunction in DLF's suit against Carpenter for tortious interference with existing contracts, conversion and theft under the Texas Theft Liability Act,[2] breach of fiduciary duty, and breach of contract. In three issues, Carpenter contends that the trial court erred in granting DLF temporary injunctive relief.[3]

We affirm.

## Background

In its second amended petition and application for injunctive relief, DLF alleged that it was a law firm that specialized in representing "individuals who ha[d] been harmed in motor vehicle accidents," as well as cases involving "premises liability . . . , plant explosions, workplace injuries, and other negligent acts." According to DLF, it "relie[d] heavily on [its] advertising efforts" and in developing trusted referral sources to gain clients. DLF "d[id] not make its referral sources or its client list public"; it allowed only its own attorneys to have access to that information.

In representing its clients against major corporations, DLF "acquired specialized knowledge" for its sole use and created "pleadings and motions" tailored "to each type of case" that it prosecuted. DLF stored the forms it created in its

---

[2]    *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001–.005.

[3]    In his reply brief, Carpenter withdrew his second issue. Thus, we consider only his first, third, and fourth issues raised in his appellant's brief.

"online server, various inter- and intra-net networks, [its] computer hard drives," and other "data centers." Further, DLF "developed proprietary software and other technological resources to service its clients." Only DLF's "trusted employees and associates ha[d] access" to those resources.

Carpenter, who was licensed to practice law in June 2021, began working for DLF in the fall of 2021 as "an associate in an at-will capacity." Through his employment with DLF, Carpenter had access to DLF's in-house forms, "current list of clients and their contact information," client referral sources, proprietary software, and other resources. While employed with DLF, Carpenter "had no significant or substantial responsibilities" as to DLF's "administrative day-to-day business," "no strategic discretion" as to "the progression of litigation matters," "no first chair trial duties," and no "independent contractual relationship with any client on whose case" he "worked during the time he worked for [DLF]." (Internal quotations omitted.)

DLF terminated Carpenter's employment on February 23, 2022. On March 22, 2022, DLF learned that Carpenter had targeted certain clients of DLF "whose cases were identified as having . . . significant value" and Carpenter had "induced" four of them "to terminate [DLF's] representation and hire Carpenter." Carpenter "did not have any independent contractual relationship with any client on whose case [he] worked during the time he worked for [DLF]." Further, Carpenter "did not

originate or source" business with any of DLF's clients whom he contacted after the termination of his employment "such that any . . . had a prior business dealing with Carpenter."

According to DLF, "Carpenter's efforts to court business away from [DLF] constitute[d] tortious interference" with its existing contracts, and "[t]he prospect" of DLF's existing clients "signing new contracts" with Carpenter "pose[d] a significant risk of irreparable harm to DLF." DLF acknowledged that it would still "retain its interest in" the cases of the clients whom Carpenter had induced to fire DLF, but "the prospect" of an inexperienced attorney, like Carpenter, "assuming duties as an unsupervised lead counsel" would likely reduce the ultimate value of those "cases and DLF's interests in those matters." As a result, DLF's "interest in" those former "clients' cases [would] significantly depreciate in value" and cause "pecuniary damage to DLF in a manner that [was] not susceptible to precise measurement and which c[ould not] be readily repaired."

DLF alleged that Carpenter's actions also showed that he was misusing "a proprietary list" of DLF's "confidential client data." On DLF's "information and belief, Carpenter [was] in possession of proprietary and confidential files belonging to DLF," including a list of its clients, "their contact information," and possibly their "highly sensitive personal information such as social security numbers" and "other identification materials," including "health information" protected under the federal

4

Health Insurance Portability and Accountability Act of 1996 ("HIPAA").[4] All of that information, according to DLF, was "subject to turnover to DLF by Carpenter" and "justifie[d] emergency intervention."

Further, DLF alleged that Carpenter had "engaged in a public-facing communications campaign seeking to harm [DLF's] professional reputation by posting defamatory per se and untrue posts to social media about [DLF]."

DLF brought claims against Carpenter for tortious interference with existing contracts, conversion and theft under the Texas Theft Liability Act, breach of fiduciary duty, and breach of contract.

In its application for temporary and permanent injunctive relief, DLF requested that the trial court order that Carpenter: (1) either "return to [DLF] all documents, forms, pleadings, electronic media . . . and technical information taken from [DLF]" or "destroy all such material and provide proof of such destruction"; (2) "cease representation of any clients" who hired him "as a result of" his "breach of [the] fiduciary duty" he owed DLF or include DLF "on any such referral obtained therefrom"; and (3) "submit all" computers, servers, "flash drives, or other hardware for inspection by [DLF's] computer forensic examiner." DLF noted that the trial court had already entered a temporary restraining order to prevent Carpenter from

---

[4] *See* 42 U.S.C. §§ 1320d–1320d–9.

(1) "continuing contact with DLF clients and attempting to solicit his business to them in tortious interference with DLF's existing contractual relationships"; (2) "continuing to access DLF's proprietary, confidential, highly sensitive, attorney-client privileged, and protected health information"; and (3) "committing ongoing conversion or theft" of DLF's personal property and "client information protected under HIPAA."

DLF argued that it had a probable right to relief because since the termination of his employment, Carpenter had "committed wrongful acts against DLF such as interfering" with DLF's client contracts and retaining control over attorney-client privileged information and protected health information belonging to DLF's clients as well as confidential and proprietary information belonging to DLF.

According to DLF, the "balancing of harms favor[ed] the issuance of the injunctive relief" it requested. Without injunctive relief, DLF would suffer irreparable harm because its clients could sue DLF "for failure to adequately protect their confidential and protected information." Also, "[i]f Carpenter succeed[ed] at convincing existing DLF clients to sign new contracts, DLF's retained interest" in those cases would "significantly depreciate in value" due to Carpenter's lack of experience and supervision and DLF's inability "to exercise managerial control" over the cases. As a result, DLF alleged, it would suffer pecuniary damage "in a

manner that [was] not susceptible to precise measurement and which c[ould not] be readily repaired."

"On the other hand," DLF maintained that Carpenter was "not likely to be prejudiced by . . . an injunction because he [would] be free to pursue new client relationships and new business which [would] not prejudice [DLF's] existing contractual relationships." DLF also argued that the injunctive relief requested "did not impose an undue hardship on Carpenter" because "[n]o client [whom] Carpenter originated or for whom Carpenter had significant or substantial responsibility [would] be affected" by the injunctive relief requested. And, according to DLF, the requested temporary injunction would maintain the status quo until the trial court determined whether a permanent injunction was appropriate.

Carpenter answered, generally denying the allegations in DLF's petition and specifically denying that DLF had suffered "any actual damages as a result of" the "acts and/or omissions" alleged in its petition. Alternatively, Carpenter asserted that "any losses or damages" that DLF had sustained were "de minimis, speculative, and/or transient in nature" and thus not legally cognizable. Carpenter also "denie[d] that he [had] failed to perform any contractual obligations under any contract" with DLF and alleged that "to the extent he [was] a party to any contract with [DLF], he satisfied all contractual obligations." Further, Carpenter raised the affirmative

7

defenses of waiver, estoppel, failure to mitigate damages, and unclean hands, and he maintained that his conduct was justified.

In response to DLF's application for temporary injunction, Carpenter asserted that DLF "failed to make a showing adequate to support a temporary injunction" under "any of its theories of recovery." Carpenter argued that "[b]ecause clients have the right" to make an informed choice about the attorney they wish to hire, "a departing attorney may not be prohibited from soliciting any of the firm's current clients or accepting employment from any of the firm's current clients." According to Carpenter, as DLF could "claim no property right" in its client contracts, it had "no right to relief under its claim" for "tortious interference with existing contracts." Further, Carpenter argued that DLF's claims for conversion and theft failed because DLF had no property right in "clients, client files" and "client information."

As to DLF's claim for breach of fiduciary duty, Carpenter observed that DLF did not allege "how [Carpenter] may have taken any action adverse to its interest." And as to DLF's breach-of-contract claim, Carpenter noted that DLF had not shown any written agreement with DLF that he had allegedly breached or any "imminent, irreparable injury in the interim" as would be required to justify injunctive relief if DLF were "able to prove the existence" and "breach of" any written agreement. Further, according to Carpenter, DLF's allegation that he had accused DLF of "attempting to deprive clients of their right to choose representative counsel" was

not actionable because it was "an accurate description" of DLF's claim for tortious interference with existing contracts.

Carpenter argued that DLF was not entitled to temporary injunctive relief because it had "failed to show any probability of a right to relief on the merits of any of its claims," that it was "likely to suffer irreparable harm in the interim," or that it "was without adequate remedy at law."

In its reply to Carpenter's response, DLF asserted that its tortious-interference-with-existing-contracts claim was straightforward: DLF "had a contingency fee contract with several clients," Carpenter, who was either "a stranger to the contracts" or an agent of DLF, "acting willfully and intentionally to serve his own personal interests at [DLF's] expense," "induced those clients to breach their contracts with [DLF], and the breach proximately caused damage to [DLF]." DLF argued that Carpenter was wrong in asserting that DLF had no property rights to protect because, unlike hourly attorney's-fee contracts, contingency-fee contracts contain assignments of interest that convey property rights in the clients' suits to the law firm. DLF also argued that it would prove a probable right to recover on its breach-of-fiduciary-duty claim because Carpenter's referral of DLF's clients, who had "contacted Carpenter in his capacity as an associate" of DLF, to his new law firm constituted self-dealing and thus a breach of his fiduciary duty to DLF.

At the hearing on DLF's application for temporary injunction, Robert Morse, a DLF partner, testified that DLF had 4,261 active cases and used a database that "allow[ed] [DLF] to run a number of reports." Creation of DLF's database took "probably . . . hundreds of thousands of hours" of work by software engineers and untold hours "on the attorney side." DLF paid "about half a million dollars just to get [the software] set up."

Morse stated that during Carpenter's employment at DLF, Carpenter had access to the "training materials" that DLF produced in-house, including "training videos" made by DLF partners and "senior attorneys" on "a variety of topics." According to Morse, much of the information contained in those training materials was confidential and proprietary.

Morse explained that DLF protected the confidentiality of its training materials and other proprietary information by having "every employee" sign an employee handbook and a "Confidentiality & Nondisclosure Agreement" (the "nondisclosure agreement"). A copy of DLF's employee handbook signed by Carpenter in acknowledgment of its receipt was admitted into evidence at the hearing, as was a copy of the nondisclosure agreement signed by Carpenter.

In signing the employee handbook, Carpenter agreed that none of DLF's confidential and proprietary information "should be divulged to persons outside [of DLF] either during or after employment, except disclosures required by legal process

10

and information specifically authorized for release by written approval from clients."

The employee handbook warned Carpenter that his "obligation to maintain" the confidentiality of DLF's information "extend[ed] beyond employment" with DLF. And the handbook warned Carpenter that he should "not assume that information or work product [was] no longer confidential or owned by [DLF] because" he was "no longer a [DLF] employee." The employee handbook also contained a "return of property clause upon termination." DLF property Carpenter would have had included keys and a "parking pass" for DLF's San Antonio office and "software" that had been downloaded on his computer.

By signing the nondisclosure agreement, Carpenter agreed to "maintain strict confidentiality" of all "confidential, proprietary, private, personal, financial, legal, operational or business information related in any manner" to DLF and its clients. Morse explained that the nondisclosure agreement provided "some financial penalties" for its violation. It contained a liquidated damages clause providing that the employee "underst[ood] and agree[d] that" "the assessment of damages for any breach of the [n]ondisclosure [a]greement may be difficult or impossible to ascertain or quantify," and obligated the employee to pay DLF $10,000.00 "as liquidated damages for such breach." The nondisclosure agreement also put the employee on notice that it "in no way limit[ed] [DLF] from pursuing . . . other legal or equitable remedies," including, "attorney's fees, damages and/or injunctive relief."

11

Morse identified certain individuals who had signed contingent-fee contracts with DLF, fired DLF, and hired Carpenter. Morse also noted that DLF's client, Jontavia Williams, sent an email to DLF notifying the firm that Carpenter had called her and asked her "to come with him to his new firm." Morse understood from Williams that Carpenter had told her that "he left [DLF]" and "that it made sense" for Williams to hire him as her attorney because "he knew [her] case." But Williams "refused" to hire Carpenter because Carpenter did not have "the resources or staff" necessary to follow "through with [her] case." A declaration describing that interaction and signed by Williams under penalty of perjury was admitted into evidence at the hearing.

Morse also explained that all of DLF's client contracts included an assignment of interest in the client's causes of action. Carpenter would have known of the existence of DLF's contingent-fee contracts with those clients because, as "his primary job responsibility," he would have been "sent out" to "sign up clients[,] so he would [have been] responsible for showing them the contract, answering any questions about the contract, explaining the contract to them, and getting their signature[s] on it."

Morse opined that Carpenter breached his fiduciary duty to DLF by "actively solicit[ing] clients" whom he "no longer represented," even though "he knew they had counsel." He did not simply tell them who their "new lawyer" at DLF was.

12

Carpenter had "reason to know" that DLF would "fully inform[]" the clients whom he had represented that he had left the firm and would give them "their new lawyer's information."

As to damages, Morse noted that because of his own experience in trying and settling high-value cases, his working relationships with other attorneys, and the size of DLF's support staff, he was able to "take significantly larger settlements and verdicts" than Carpenter, who had "never been in a courtroom." Carpenter did not have an office or support staff, and in an email sent to DLF during his employment, which was admitted into evidence, Carpenter stated that he "barely kn[e]w how to do discovery." Morse also testified that while at DLF, Carpenter was not "do[ing] the minimum" required to maintain the "small docket" that had been assigned to him. Carpenter "wasn't noticing depositions, wasn't sending discovery," and "wasn't filing lawsuits." Those performance problems, according to Morse, contributed to DLF's decision to terminate Carpenter's employment.

Because of Carpenter's lack of experience and resources, Morse opined that Carpenter would not be able to "get the same results" in most cases that DLF would have gotten. DLF was harmed by having Carpenter take clients from DLF because doing so lowered the value of their cases, and DLF had "a piece of every one" of those clients' cases.

13

Carpenter responded at the hearing by proffering two declarations that he had signed. In one, Carpenter focused on his work for DLF in Austin and summarized a conversation he had with the Texas Bar Association's Office of Disciplinary Counsel. In the other, Carpenter denied having worked in Harris County, Texas and stated that the "clients [who] fired [DLF] and hired [him] live[d] in the Austin area and their cases" were filed in Travis County, Texas.

In its amended order granting DLF a temporary injunction, the trial court found that DLF "demonstrated a probable right of recovery" and that Carpenter's actions, if not enjoined, would

> create imminent and irreparable injury to [DLF] with no adequate remedy at law by tortiously interfering with [DLF's] attorney/client contracts and improperly using confidential/proprietary information to which Carpenter gained general access unrelated to his function of attorney representing DLF clients.

Further, because "DLF owe[d] itself and its clients a duty to take reasonable steps to protect its confidential/proprietary information which [Carpenter] may have improperly taken and should return and/or preserve in the course of th[e] litigation to prevent spoliation," the trial court prohibited Carpenter from disclos[ing], duplicat[ing], or disseminat[ing]" any of DLF's confidential data or documents that he may have taken from DLF and were still in his possession or control "except at the direction of a [DLF] client or former client." The trial court also required Carpenter to "provide a list of clients who originated from [DLF] that he ha[d]

14

contacted and/or currently represent[ed] since his termination from [DLF].”  And the trial court prohibited Carpenter “from destroying or altering or duplicating . . . data obtained from [DLF] located on any . . . computer hardware in [his] possession, custody, or control” and required him to hold it for “inspection by [DLF’s] computer forensic examiner with an eye . . . [for] making a forensic copy for potential later inspection” by DLF if permitted by further order of the trial court.

As to DLF’s clients, the trial court enjoined Carpenter “from making any contact” with anyone on “the list of DLF clients to which [he] had general access solely as a result of his employment” with DLF unless he had “formed an attorney/client relationship with” the DLF client before the termination of his employment.  The trial court declared that “[n]othing” in its order was to “be construed to prevent [Carpenter] from fulfilling his professional duties to his clients.”

The trial court also entered findings of fact and conclusions of law, including that Carpenter “ha[d] a right to properly contact former DLF clients he represented or formed an attorney/client relationship with while employed by [DLF],” “retain” the work-product that he created while employed by DLF, and “receive client files that the client direct[ed]” DLF to send to him.  But Carpenter was not entitled to “possess [DLF] client lists that include[d] clients with whom” he had “never formed an attorney/client relationship” or “use [DLF] client lists to solicit new business”

15

from DLF clients "with whom [Carpenter] never formed an attorney/client relationship." The trial court concluded that "[t]o the extent" that Carpenter had "engaged in" such conduct, he would be liable to DLF "for taking the [DLF] client list he was not authorized to take and breaching his agreement to not take and to keep confidential general information he gained access to outside of [an] attorney/client relationship."

The trial court found that DLF was entitled to temporary injunctive relief based on its claim against Carpenter for tortious interference with existing contracts. As to that claim, the trial court found that

- DLF "had at least four attorney/client contracts which were subject to being interfered with by Carpenter after Carpenter's termination of employment";

- Carpenter "engaged in willful and intentional conduct designed to wrongfully interfere with [DLF's] attorney/client contracts";

- Carpenter "likely failed to disclose to four prospective clients . . . the inherent problems clients would experience if they terminated the [DLF] attorney/client contract and formed a new attorney/client contract with Carpenter";

- DLF "would likely retain its attorney fee and expense liens which would make it more difficult to get the case[s] resolved";

- Carpenter "lacked the skill and resources necessary to properly prosecute the client's case such that the client's case would likely be of less value" if handled by Carpenter rather than DLF; and

- The value of DLF's loss was "difficult to measure" and, while "the law [could] attempt to measure the loss," the better practice would be to "stop the wrongful behavior to avoid the termination of future attorney/client contracts," and "[w]ithout enjoining" Carpenter, he was "likely to continue

16

in his wrongful practice of engaging DLF clients without making proper disclosures resulting in more and more termination of [DLF] attorney/client contracts."

As to DLF's remaining claims against Carpenter, which required DLF to show that Carpenter "ha[d] in fact taken confidential/proprietary information and disclosed it to third parties or used it or threatened to use it for his own gain or otherwise do harm to DLF," the trial court concluded that DLF had not made the requisite showing. The trial court found that Carpenter had "returned to DLF the computers [that] DLF [had] provided for him to do DLF work." But the trial court observed that the "forensic record of other electronic devices may prove otherwise," so it "consider[ed] the injunctive relief justified under the remaining causes of action to prevent spoliation of evidence," observing that DLF had "an obligation to verify whether" Carpenter had "taken confidential/proprietary information and if so, to enjoin [him] from using or continuing to possess such data."

**Jurisdiction**

In his first issue, Carpenter argues that the trial court lacked jurisdiction to consider DLF's application for temporary injunction "because venue [was] not proper in Harris County." In making this argument, Carpenter relies on Texas Civil Practice and Remedies Code section 65.023, which is a venue statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 65.023; *In re Fox River Real Estate Holdings, Inc.*, 596 S.W.3d 759, 765 (Tex. 2020).

17

Jurisdiction is not the same thing as venue. Jurisdiction refers to the authority of a court to decide a case. *Radenovic v. Eric D. Fein, P.C. & Assocs.*, 198 S.W.3d 858, 860 (Tex. App.—Dallas 2006, no pet.). Venue, on the other hand, has to do with the place or county where a case may be tried. *In re Parr*, 199 S.W.3d 457, 461 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see Radenovic*, 198 S.W.3d at 860.

A court must have both subject-matter jurisdiction over a case and personal jurisdiction over a party to issue a binding order or judgment. *CSR Ltd. v. Link*, 925 S.W.2d 581, 594 (Tex. 1996); *Mass. Bay Ins. Co. v. Adkins*, 615 S.W.3d 580, 610 (Tex. App.—Houston [1st Dist.] 2020, no pet.). Carpenter did not challenge the trial court's subject-matter jurisdiction below or specifically raise that issue here, but subject-matter jurisdiction cannot be waived and can be raised at any time while the suit is pending, either by the parties or by the court. *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 358 (Tex. 2004); *Harris Cnty. Fresh Water Supply Dist. No. 61 v. Magellan Pipeline Co., L.P.*, 649 S.W.3d 630, 646 (Tex. App.—Houston [1st Dist.] 2022, pet. filed). The determination as to whether jurisdiction exists is a question of law which we review de novo. *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998).

The Texas Constitution and legislative enactments confer subject-matter jurisdiction, combined with the existence of the facts necessary for a court to

exercise jurisdiction. *French v. Moore*, 169 S.W.3d 1, 5 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The allegations in the plaintiff's petition ordinarily establish the amount in controversy for a jurisdictional analysis. *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 449 (Tex. 1996); *see also Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000) (jurisdictional challenges based upon amount in controversy "must ordinarily be decided solely on the pleadings"). We presume that a trial court has jurisdiction unless the absence of jurisdiction affirmatively appears on the face of the petition. *French*, 169 S.W.3d at 5.

In its second amended petition, DLF alleged that "[j]urisdiction [was] proper because the amount in controversy [wa]s within the jurisdictional limits" of the trial court, and nothing in the record refutes that allegation. Carpenter does not identify any other reason as to why the trial court might lack subject-matter jurisdiction in this case. Thus, there is no basis for concluding that the trial court lacked subject-matter jurisdiction over DLF's suit against Carpenter. *See French*, 169 S.W.3d at 5.

As to whether the trial court had personal jurisdiction over Carpenter, we note that in his motion to continue the hearing on DLF's application for temporary injunction, Carpenter alluded to filing a special appearance to challenge personal jurisdiction. *See* TEX. R. CIV. P. 120a. But Carpenter never filed a special appearance, and he made a general appearance when he filed his answer to DLF's

19

suit. *See Baker v. Monsanto Co.*, 111 S.W.3d 158, 160 (Tex. 2003); *Radenovic*, 198 S.W.3d at 860. Because Carpenter made a general appearance, he waived any challenge to personal jurisdiction. *See* Tex. R. Civ. P. 120a(1); *Adkins*, 615 S.W.3d at 597. Thus, there is no basis for concluding that the trial court lacked personal jurisdiction over Carpenter.

To the extent Carpenter still complains about whether Harris County is a proper venue for DLF's suit, the record shows that after he filed this appeal, the trial court granted Carpenter's motion to transfer venue to Travis County. As a result, any complaint about whether Harris County constituted a proper venue is moot. *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 162 (Tex. 2012); *In re Freestanding Emergency Room Managers of Am., L.L.C.*, No. 14-19-00074-CV, 2019 WL 4071958, at *1 (Tex. App.—Houston [14th Dist.] Aug. 29, 2019, orig. proceeding) (mem. op.) (dismissing as moot petition for writ of mandamus to compel trial court to vacate order transferring venue to Austin County, Texas after trial court reconsidered ruling and issued order denying motion to transfer venue).

Based on the foregoing, we hold that the trial court did not lack jurisdiction to consider DLF's application for temporary injunction.

We overrule Carpenter's first issue.

20

**Temporary Injunction**

In his third and fourth issues, Carpenter argues that the trial court erred in granting DLF temporary injunctive relief because "[t]he temporary injunction [order] issued . . . [was] not adequately specific about the harm that would occur absent its issuance" and DLF "fail[ed] to show a probable right of recovery as to any of its claims or . . . imminent, irreparable injury in the interim prior to trial."

The purpose of a temporary injunction is "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 555 (Tex. 2016) (internal quotations omitted); *Green Acquisitions, Inc. v. Everlasting Green, LLC*, No. 01-21-00257-CV, 2022 WL 2919936, at *3 (Tex. App.—Houston [1st Dist.] July 26, 2022, no pet.) (mem. op.). The "status quo" is the "last, actual, peaceable, non-contested status which preceded the pending controversy." *Marquez*, 487 S.W.3d at 555 (internal quotations omitted).

A "temporary injunction is an extraordinary remedy and does not issue as a matter of right." *Walling v. Metcalfe*, 863 S.W.2d 56, 57 (Tex. 1993); *Patel v. St. Luke's Sugar Land P'ship, L.L.P.*, 445 S.W.3d 413, 419 (Tex. App.—Houston [1st Dist.] 2013, pet. denied). To obtain a temporary injunction, an applicant must establish: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*

*v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); *Patel*, 445 S.W.3d at 419. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. The applicant need not establish that it will prevail at trial; rather, "the only question before the trial court is whether the applicant is entitled to preservation of the status quo of the subject matter of the suit pending trial on the merits." *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978); *see also Patel*, 445 S.W.3d at 419.

Appellate courts review a trial court's ruling on an application for a temporary injunction for a clear abuse of discretion. *Henry v. Cox*, 520 S.W.3d 28, 33 (Tex. 2017); *Patel*, 445 S.W.3d at 419. Our review is limited to the validity of the trial court's temporary injunction order; we do not consider or determine the merits of the underlying case. *Henry*, 520 S.W.3d at 33–34; *Patel*, 445 S.W.3d at 420. We review the evidence before the trial court in the light most favorable to its ruling, drawing all legitimate inferences from the evidence, and deferring to the trial court's resolution of conflicting evidence. *Patel*, 445 S.W.3d at 419–20. We will only overturn a temporary injunction order if it is "so arbitrary that it exceed[s] the bounds of reasonable discretion." *Henry*, 520 S.W.3d at 34 (alteration in original) (internal quotations omitted). There is no abuse of discretion if the trial court's ruling is reasonably supported by some evidence, even if the evidence is disputed. *Patel*, 445

22

S.W.3d at 419; *see also Henry*, 520 S.W.3d at 34. As fact finder, the trial court is the sole judge of the credibility of the witnesses and evidence. *Daniels v. Battie*, No. 05-21-00335-CV, 2023 WL 1462848, at *1 (Tex. App.—Dallas Feb. 2, 2023, no pet.) (mem. op.); *see also Regal Ent. Grp. v. iPic Gold Class Ent., LLC*, 507 S.W.3d 337, 352 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

## A.    Compliance with Texas Rule of Civil Procedure 683

In his third issue, Carpenter argues that the trial court erred in granting DLF temporary injunctive relief because it did not set forth specific reasons as to why an injunction was necessary to prevent injury to DLF's rights during the pendency of the case.

Texas Rule of Civil Procedure 683 requires that a temporary injunction order state the reasons for its issuance. TEX. R. CIV. P. 683. The order must also set forth the reasons why the trial court believes irreparable injury will result if an injunction preserving the status quo pending a trial on the merits is not granted. *Id.* And the temporary injunction order must "describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained." *Id.* These requirements are mandatory, and an order that does not comply with rule 683 "is subject to being declared void and dissolved." *Qwest Commc'ns Corp. v. AT & T Corp.*, 24 S.W.3d 334, 337 (Tex. 2000); *Clark v. Hastings Equity Partners, LLC*, 651 S.W.3d 359, 370 (Tex. App.—Houston [1st Dist.] 2022, no pet.).

23

As to the need for the temporary injunction, the trial court found that without injunctive relief, Carpenter would "create imminent and irreparable injury to [DLF] with no adequate remedy at law by tort[i]ously interfering with [DLF's] attorney/client contracts and improperly using confidential/proprietary information to which [Carpenter had] gained general access unrelated to his function of attorney representing DLF clients." Further, the trial court found that "[w]ithout enjoining [Carpenter], he [was] likely to continue in his wrongful practice of engaging DLF clients without making proper disclosures . . . ."

For purposes of obtaining a temporary injunction, DLF was not required to conclusively show that Carpenter actually had its confidential information. The likelihood that a defendant possesses, has disclosed, or will disclose confidential information is sufficient to support injunctive relief barring its disclosure. *See Sandberg v. STMicroelecs., Inc.*, 600 S.W.3d 511, 537 (Tex. App.—Dallas 2020, pet. denied); *Q'Max Am., Inc. v. Screen Logix, LLC*, No. 01-15-00319-CV, 2016 WL 796838, at *8 (Tex. App.—Houston [1st Dist.] Mar. 1, 2016, no pet.) (mem. op.); *see generally Butnaru*, 84 S.W.3d at 204 (applicant for temporary injunction has burden to show "probable, imminent, and irreparable injury" absent relief).

Carpenter appears to argue that the trial court's findings are insufficient to support the temporary injunctive relief because the trial court found that DLF had not shown that Carpenter had "taken confidential proprietary information and

24

disclosed it to third parties or used it or threatened to use it for his own gain or otherwise to do harm to DLF." But the finding relied on by Carpenter does not encompass DLF's confidential client information, which the trial court found Carpenter was misusing. And the trial court acknowledged that even without definite proof that Carpenter had taken other confidential information from DLF, DLF still had a professional "obligation to verify whether" Carpenter had taken such information, "and if so, to enjoin [him] from using or continuing to possess" it.

Courts have consistently concluded that injunctive relief is an appropriate remedy to prevent the disclosure or misuse of confidential information. *See, e.g.*, *Sandberg*, 600 S.W.3d at 537 (holding trial court did not err in granting permanent injunction to prevent defendant, who was a certified public accountant and tax attorney, from certain actions where evidence showed he had "likely retained" and "used or disclosed" former employer's confidential information); *Q'Max Am.*, 2016 WL 796838, at *6, 8 (affirming temporary injunction barring defendants, who were plaintiff's former employees, from performing consulting agreement where evidence supported trial court's finding that performance of consulting agreement likely would result in disclosure of plaintiff's trade secrets and confidential information); *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc.*, 965 S.W.2d 18, 24 (Tex. App.—Houston [1st Dist.] 1998, pet. dism'd) (where evidence indicated that defendants, who were plaintiff's former employees, possessed plaintiff's

confidential information and were in position to use it to compete directly with plaintiff, it was likely that defendants would use information to plaintiff's detriment, and only effective relief available to plaintiff was to restrain defendants' use of its trade secrets and confidential information pending trial).

Here, the trial court enjoined Carpenter from misusing DLF's confidential client information to interfere with DLF's existing client relationships. The trial court also enabled DLF to protect its professional responsibilities by ascertaining whether Carpenter had other confidential information belonging to the firm and prohibited its disclosure if he did. We hold that the trial court complied with Texas Rule of Civil Procedure 683's requirement to state specific reasons as to why the temporary injunction was necessary.

We overrule Carpenter's third issue.

## B.     Evidentiary Support for Temporary Injunction Order

In his fourth issue, Carpenter argues that the trial court erred in granting DLF temporary injunctive relief because DLF "fail[ed] to show a probable right of recovery as to any of its claims or to show imminent, irreparable injury in the interim prior to trial."

A probable right of success on the merits is shown by alleging a cause of action and presenting evidence that tends to sustain it. *Intercont'l Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.]

26

2011, no pet.); *T-N-T Motorsports, Inc.*, 965 S.W.2d at 23–24. Here, the trial court concluded that DLF was entitled to a temporary injunction because it showed a probable right to recovery on its claim against Carpenter for tortious interference with existing contracts.

"A claim for tortious interference with a contract consists of four elements: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the willful and intentional interference caused damage; and (4) actual damage or loss occurred." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017); *Vertex Servs., LLC v. Oceanwide Houston, Inc.*, 583 S.W.3d 841, 853 (Tex. App.—Houston [1st Dist.] 2019, no pet.).

Carpenter argues that the trial court erred in concluding that there was evidence tending to show that Carpenter willfully and intentionally interfered with DLF clients' contracts because it could not have properly relied on the declaration of DLF's client Williams that Carpenter had "tried to convince" her to "come to his new firm as his client" but did not inform her that if she did so, DLF would retain its fee and expense interest in her case.[5] Carpenter reiterates the hearsay objection

---

[5] Carpenter relies on statements of professional ethics to assert that he had the "obligation to inform his clients" when he left DLF and the clients had "the right to make an informed choice about their counsel." But nothing in the trial court's temporary injunction order prohibited Carpenter from fulfilling his professional responsibilities to his clients. On the contrary, the trial court expressly found that Carpenter "had a right to properly contact former DLF clients he [had] represented or formed an attorney/client relationship with" during his employment with DLF,

27

to Williams's declaration that he made unsuccessfully in the trial court, but this evidentiary complaint does not correspond to any of the "issues presented" in his appellant's brief. *See Wilson v. Empire Towing LLC*, No. 01-18-01145-CV, 2019 WL 3484216, at \*2 n.3 (Tex. App.—Houston [1st Dist.] Aug. 1, 2019, no pet.); *Hooks v. Brenham Hous. Auth.*, No. 01-17-00602-CV, 2018 WL 6061307, at \*3 (Tex. App.—Houston [1st Dist.] Nov. 20, 2018, no pet.) (mem. op.) (holding appellant waived complaints on appeal where assertions in "Argument" section of appellant's brief "d[id] not correspond to the two questions that he ha[d] designated as his issues on appeal" (internal quotations omitted)).

Further, in his appellant's brief, Carpenter does not cite to any legal authority applicable to the analysis of his evidentiary complaint beyond the general hearsay rule. *See* TEX. R. EVID. 801; TEX. R. APP. P. 38.1(i); *Wilson*, 2019 WL 3484216, at \*2. And Carpenter does not provide any substantive analysis, with citation to legal authority, to support his assertion that the evidence before the trial court otherwise failed to support its finding that DLF presented evidence tending to show that Carpenter willfully and intentionally interfered with DLF's existing contractual relationship with its clients. *See* TEX. R. APP. P. 38.1(i).

---

and the temporary injunction order was not to "be construed to prevent" Carpenter "from fulfilling his professional responsibilities to his clients."

The failure to provide substantive analysis of an issue or cite appropriate authority waives a complaint on appeal. *Marin Real Estate Ptrs. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.); *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Thus, Carpenter waived his challenge to the trial court's finding that he had "engaged in willful and intentional conduct designed to wrongfully interfere with [DLF's] attorney/client contracts."

Finally, Carpenter argues that the trial court erred in granting DLF temporary injunctive relief because DLF had no evidence of actual damages or that the damages were "impossible to calculate."

As evidence of damages, Morse testified that DLF's client contracts included an assignment of interest in the clients' claims and that the ultimate value of DLF's interest in those cases would be substantially less if they were prosecuted by Carpenter, a first-year attorney without an office or support staff, than if the cases had remained with DLF, a firm with experienced attorneys and support staff. Morse also testified that while at DLF, Carpenter was not "do[ing] the minimum" required to maintain the "small docket" assigned to him. Carpenter "wasn't noticing depositions, wasn't sending discovery," and "wasn't filing lawsuits." And Carpenter conceded in an email sent to DLF that he "barely kn[e]w how to do discovery." This

evidence, which was undisputed, constitutes some evidence in support of the trial court's finding that Carpenter's interference with DLF's client contracts caused actual damage or loss to DLF. *See Rincones*, 520 S.W.3d at 588; *Vertex Servs.*, 583 S.W.3d at 853.

As to Carpenter's complaint that the trial court erred in finding that DLF showed that it would suffer irreparable harm without temporary injunctive relief, the trial court was not required to find, as Carpenter suggests, that DLF's damages were "impossible to calculate," only that they were difficult to calculate. *See Butnaru*, 84 S.W.3d at 204 ("An injury is irreparable . . . if the damages cannot be measured by any certain pecuniary standard"); *Rollins v. Univ. Coin & Bullion, Ltd.*, No. 09-06-150-CV, 2006 WL 2883122, at *4 (Tex. App.—Beaumont Oct.12, 2006, no pet.) (mem. op); *see also Martin v. Linen Sys. For Hosps., Inc.*, 671 S.W.2d 706, 710 (Tex. App.—Houston [1st Dist.] 1984, no writ) (observing it is not easy to assign dollar amount to intangibles such as company's loss of clientele, goodwill, marketing techniques, and office stability).

We hold that the trial court did not err in finding that DLF satisfied its burden to show that it had a probable right to recovery on its tortious-interference-with-existing-contracts claim and that it would suffer imminent, irreparable injury without a temporary injunction.

We overrule Carpenter's fourth issue.

30

## Conclusion

We affirm the order of the trial court.

Julie Countiss
Justice

Panel consists of Justices Landau, Countiss, and Guerra.